Filed 8/5/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| NEIGHBORS FOR SMART RAIL, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S202828 |
| v. | ) | |
| | ) | Ct.App. 2/8 B232655 |
| EXPOSITION METRO LINE | ) | |
| CONSTRUCTION AUTHORITY et al., | ) | |
| | ) | Los Angeles County |
| Defendants and Respondents; | ) | Super. Ct. No. BS125233 |
| | ) | |
| LOS ANGELES COUNTY | ) | |
| METROPOLITAN TRANSPORTATION | ) | |
| AUTHORITY et al., | ) | |
| | ) | |
| Real Parties in Interest. | ) | |
| _____ | ) | |

This case presents a challenge under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] to the approval by defendant Exposition Metro Line Construction Authority (Expo Authority) of a project to construct a light-rail line running from Culver City to Santa Monica. Once completed, the transit line is to be operated by real party in interest Los Angeles County Metropolitan Transportation Authority (MTA).

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

Plaintiff Neighbors for Smart Rail (Neighbors) contends the Expo Authority's environmental impact report (the EIR) for the project is deficient in two respects: (1) by exclusively employing an analytic baseline of conditions in the year 2030 to assess likely impacts on traffic congestion and air quality, the EIR fails to disclose the effects the project will have on *existing* environmental conditions in the project area; and (2) the EIR fails to incorporate mandatory and enforceable mitigation measures for potentially significant spillover parking effects in the neighborhoods of certain planned rail stations.

We agree with Neighbors on its first claim, but not on its second. (1) While an agency has the discretion under some circumstances to omit environmental analysis of impacts on existing conditions and instead use only a baseline of projected future conditions, existing conditions "will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Cal. Code Regs., tit. 14, § 15125, subd. (a).) A departure from this norm can be justified by substantial evidence that an analysis based on existing conditions would tend to be misleading or without informational value to EIR users. Here, however, the Expo Authority fails to demonstrate the existence of such evidence in the administrative record. (2) The EIR's mitigation measure for spillover parking effects satisfied CEQA's requirements by including enforceable mandates for actions by MTA and the Expo Authority, as well as planned actions to be implemented by the municipalities responsible for parking regulations on streets near the planned rail stations. (§ 21081, subd. (a); Cal. Code Regs., tit. 14, § 15091.)

Although we conclude the EIR fails to satisfy CEQA's requirements in the first respect claimed, we also conclude the agency's abuse of discretion was nonprejudicial. Under the particular facts of this case, the agency's examination of certain environmental impacts only on projected year 2030 conditions, and not

2

on existing environmental conditions, did not deprive the agency or the public of substantial relevant information on those impacts. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 485-486.) We will therefore affirm the judgment of the Court of Appeal, which affirmed the superior court's denial of Neighbors's petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

Formally known as phase 2 of the Exposition Corridor Transit Project (Expo Phase 2), the project at issue consists of a light-rail transit line running from a station in Culver City (the western terminus of phase 1, which connects to downtown Los Angeles), through the Westside area of the City of Los Angeles, to a terminus in Santa Monica. The project's purpose is to provide high-capacity transit service between the Westside area of Los Angeles and Santa Monica, thereby accommodating population and employment growth in the area, improving mobility for the large population of transit-dependent Westside residents, providing an alternative to the area's congested roadways, and enhancing access to downtown Los Angeles, Culver City, Santa Monica, and other destinations in the corridor.

The Expo Authority issued a notice of preparation of an EIR for Expo Phase 2 in February 2007, circulated a draft EIR for public comment in January 2009, and published its final EIR in December 2009. In February 2010, it certified the EIR's compliance with CEQA, selected the transit mode and route recommended in the EIR, and approved the Expo Phase 2 project.

Neighbors petitioned the superior court for a writ of mandate, alleging the Expo Authority's approval of Expo Phase 2 violated CEQA in several respects. The superior court denied the petition in full, and the Court of Appeal affirmed, rejecting all of Neighbors's CEQA claims on the merits. We granted Neighbors's

3

petition for review, which raised only two issues: the propriety of the Expo Authority's exclusive use of a future conditions baseline for assessment of the project impacts on traffic and air quality, and the adequacy of the mitigation measure the Expo Authority adopted for possible impacts on street parking near planned transit stations. We resolve those two issues below.

## DISCUSSION

### I. Use of Future Conditions as a Baseline for Analysis of Project Impacts[2]

The fundamental goal of an EIR is to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment. (§ 21061; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428.) To make such an assessment, an EIR must delineate environmental conditions prevailing absent the project, defining a "baseline" against which predicted effects can be described and quantified. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 (*Communities for a Better Environment*).) The question posed here is whether that baseline may consist *solely* of conditions projected to exist absent the project at a date in the distant future or whether the EIR must include an analysis of the project's significant impacts on measured conditions existing at the time the environmental analysis is performed.

The Expo Authority's chosen analytic method and its stated reasons for that choice will be described in detail below; suffice it here to say the agency first

---

**2** With the exception of part II.B.5., *post*, which addresses prejudice, the analysis in this part (as well as that in pt. II., *post*) expresses the view of a majority of the court. (See conc. & dis. opn. of Liu, J., *post*, at pp. 1-3, 5.)

4

projected the traffic and air quality conditions that would exist in the project area in the year 2030, then estimated the effect that operation of the Expo Phase 2 transit line would have on those conditions at that future time. With regard to traffic delays due to the rail line crossing streets at grade, the EIR found some adverse effects were likely in 2030, but none rising to a level deemed significant. With regard to air quality, no adverse effects were projected to occur; the project was expected to have a generally beneficial impact on air quality by slightly reducing automobile travel in the study area in comparison with conditions otherwise expected in 2030.

Neighbors contends the Expo Authority proceeded contrary to CEQA's commands, thus abusing its discretion as a matter of law (§ 21168.5), in its choice of a baseline for analysis of traffic and air quality impacts. The Expo Authority and the MTA contend agencies have discretion to choose future conditions baselines if their choice is supported by substantial evidence, as the Expo Authority's choice assertedly was here.[3] We first ask whether an agency's discretion *ever* extends to use of a future conditions baseline to the exclusion of one reflecting conditions at the time of the environmental analysis. Concluding that existing conditions is the normal baseline under CEQA, but that factual circumstances can justify an agency departing from that norm when necessary to prevent misinforming or misleading the public and decision makers, we then ask

---

[3]     The Expo Authority also contends Neighbors failed to exhaust the future conditions baseline issue in the administrative forum. The Court of Appeal held the issue exhausted, and the Expo Authority did not raise the exhaustion issue in its answer to Neighbors's petition for review. As the exhaustion question was not raised in the petition for review or answer, and is not fairly included in the merits of the baseline issue on which we granted review, we decline to address it here. (See Cal. Rules of Court, rule 8.520(b)(3).)

5

whether the administrative record here contains substantial evidence of such circumstances.

### A. Use of Future Conditions Baselines Generally

For the proposition that the baseline for an EIR's significant impacts analysis must reflect existing conditions, Neighbors relies heavily on section 15125, subdivision (a) of the CEQA Guidelines,[4] which provides: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. *This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.*" (Cal. Code Regs., tit. 14, § 15125, subd. (a) (Guidelines section 15125(a)), italics added.)

In *Communities for a Better Environment*, we relied on Guidelines section 15125(a) and CEQA case law for the principle that the baseline for an agency's primary environmental analysis under CEQA must ordinarily be the *actually* existing physical conditions rather than *hypothetical* conditions that could have existed under applicable permits or regulations. (*Communities for a Better*

---

**4** The CEQA Guidelines, promulgated by the state's Natural Resources Agency, are authorized by section 21083 and found in title 14 of the California Code of Regulations, section 15000 et seq. By statutory mandate, the Guidelines provide "criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment.' " (§ 21083, subd. (b).) In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous. (*Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 319, fn. 4; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*, *supra*, 40 Cal.4th at p. 428, fn. 5.)

6

*Environment*, *supra*, 48 Cal.4th at pp. 320-322.) Applying this principle, we held the air pollution effects of a project to expand a petroleum refinery were to be measured against the existing emission levels rather than against the levels that would have existed had all the refinery's boilers operated simultaneously at their maximum permitted capacities. (*Id.* at pp. 322-327.)

In a separate part of the *Communities for a Better Environment* analysis, we addressed the problem of defining an existing conditions baseline in circumstances where the existing conditions themselves change or fluctuate over time, as the refinery's operations and emissions assertedly did. (*Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 327-328.) We concluded that despite the CEQA Guidelines' reference to "the time the notice of preparation is published, or if no notice of preparation is published, . . . the time environmental analysis is commenced" (Guidelines, § 15125(a)), "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence." (*Communities for a Better Environment*, at p. 328.)

*Communities for a Better Environment* provides guidance here in its insistence that CEQA analysis employ a realistic baseline that will give the public and decision makers the most accurate picture practically possible of the project's likely impacts. (*Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 322, 325, 328.) It did not, however, decide either the propriety of using solely a future conditions baseline or the standard of review by which such a choice is to be judged. Our holding that the analysis must measure impacts against actually existing conditions was in contrast to the use of hypothetical permitted conditions,

7

not projected future conditions. And our holding that agencies enjoy discretion to choose a suitable baseline, subject to review for substantial evidence, related to the choice of a measurement technique for existing conditions, not to the choice between an existing conditions baseline and one employing solely conditions projected to prevail in the distant future.

Justice Baxter therefore errs in citing *Communities for a Better Environment* for the proposition that an agency's future baseline choice is valid if it is "a realistic measure of the physical conditions without the proposed project . . . ." (Conc. & dis. opn. of Baxter, J., *post*, at p. 7.) In *Communities for a Better Environment*, we held an agency's discretionary decision on "exactly how the *existing* physical conditions without the project can most realistically be measured" is reviewed for substantial evidence supporting the measurement method. (48 Cal.4th at p. 328, italics added.) We did not hold or imply agencies enjoy equivalent discretion under CEQA and the CEQA Guidelines to *omit* all analysis of the project's impacts on existing conditions and measure impacts only against conditions projected to prevail 20 or 30 years in the future, so long as their projections are realistic.

Nor does the concurring and dissenting opinion's citation to *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316 aid its argument. (Conc. & dis. opn. of Baxter, J., *post*, at p. 6.) The cited decision merely applied *Communities for a Better Environment* to determine that a water allocation approximating the property's recent historical use constituted a realistic measure of existing conditions. (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont*, *supra*, 190 Cal.App.4th at pp. 337-338.) The case has nothing to say about an agency's decision to omit an existing conditions analysis and employ solely a baseline of conditions in the distant future.

The Courts of Appeal, however, have since addressed the future conditions baseline question directly in *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351 (*Sunnyvale West*), *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, and *Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552 (*Pfeiffer*), as well as in the present litigation.

In *Sunnyvale West,* the appellate court held inadequate an EIR's analysis of a road extension project's traffic impacts because it used projected conditions in the year 2020 as its only baseline, even though EIR preparation began in 2007 and the project was approved in 2008.  (*Sunnyvale West*, *supra*, 190 Cal.App.4th at pp. 1358, 1360, 1370.)  While acknowledging that Guidelines section 15125(a) and our decision in *Communities for a Better Environment* provided agencies discretion on how best to measure *existing* conditions, the court concluded "nothing in the law authorizes environmental impacts to be evaluated only against predicted conditions more than a decade after EIR certification and project approval." (*Sunnyvale West*, at p. 1380.)  The use of a single future conditions baseline was per se a violation of CEQA; it was not a discretionary choice that could be justified by substantial evidence.  (*Sunnyvale West*, at p. 1383.)

The *Sunnyvale West* court observed that, although in its view the baseline for analysis of a project's direct impacts must be existing conditions, "discussions of the foreseeable changes and expected future conditions . . . may be necessary to an intelligent understanding of a project's impacts over time and full compliance with CEQA." (*Sunnyvale West*, *supra*, 190 Cal.App.4th at p. 1381.)  In particular, the effects of the project under predicted future conditions, themselves projected in part on the assumption that other approved or planned projects will proceed, are appropriately considered in an EIR's analysis of cumulative impacts (see Cal. Code Regs., tit. 14, § 15130) or in a discussion comparing the project to the "no

9

project alternative" (*id.*, § 15126.6, subd. (e)).  (*Sunnyvale West*, at pp. 1381-1382.)  So long as the EIR evaluated the project's significant impacts on existing conditions, the court saw "no problem" with *also* examining the effect on projected future conditions "where helpful to an intelligent understanding of the project's environmental impacts."  (*Id.* at p. 1382.)

The court in *Madera Oversight Coalition, Inc. v. County of Madera*, considering the adequacy of an EIR's discussion of a mixed-use property development's traffic impacts, followed *Sunnyvale West* on the baseline question. Without extensive additional statutory analysis, the court adopted from *Sunnyvale West* the rule that agencies "do not have the discretion to adopt a baseline that uses conditions predicted to occur on a date subsequent to the certification of the EIR." (*Madera Oversight Coalition, Inc. v. County of Madera*, *supra*, 199 Cal.App.4th at p. 90.)

In *Pfeiffer*, a different panel of the same court that decided *Sunnyvale West* reviewed the EIR for a medical center's expansion project.  The EIR's analysis of traffic impacts compared, for various road segments and intersections in the project's vicinity, existing traffic conditions with various growth and project scenarios.  (*Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1571.)  Holding the plaintiffs had not shown this analysis inadequate under CEQA, *Pfeiffer* distinguished *Sunnyvale West* as involving the use of *only* a future conditions baseline, whereas in *Pfeiffer* "the traffic baselines included in the EIR were not limited to projected traffic conditions in the year 2020, but also included existing conditions and the traffic growth anticipated from approved but not yet constructed developments." (*Pfeiffer*, at p. 1573.)

The appellate court in the present case flatly disagreed with the *Sunnyvale West* analysis.  Noting that Guidelines section 15125(a) states the EIR's description of existing environmental conditions " '*normally*' " serves as the

10

baseline for analysis of project impacts, the court reasoned that "[t]o state the norm is to recognize the possibility of departure from the norm" and concluded the *Sunnyvale West* court erred in finding in the law an absolute rule against use of projected future conditions as the baseline. In the lower court's view, future conditions are properly used as a baseline if the projections on which they are based are reliable and their use "provide[s] information that is relevant and permits informed decisionmaking."

We conclude CEQA and the Guidelines dictate a rule less restrictive than *Sunnyvale West*'s but more restrictive than that articulated by the Court of Appeal below. Projected future conditions may be used as the sole baseline for impacts analysis if their use in place of measured existing conditions—a departure from the norm stated in Guidelines section 15125(a)—is justified by unusual aspects of the project or the surrounding conditions. That the future conditions analysis would be informative is insufficient, but an agency does have discretion to completely omit an analysis of impacts on existing conditions when inclusion of such an analysis would detract from an EIR's effectiveness as an informational document, either because an analysis based on existing conditions would be uninformative or because it would be misleading to decision makers and the public.

Before addressing the use of a future conditions baseline, we pause to clarify some potentially confusing aspects of the standard analysis, in which the project's impacts are assessed against existing environmental conditions. First, although most projects for which an EIR is prepared do not yet exist or are not yet in operation at the time the EIR is written, it is common for an EIR's impacts analysis to assume, counterfactually, that the project exists and is in full operation at the time the environmental analysis is conducted. (See, e.g., *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 916-917, 933

11

[EIR analyzed impacts on city's existing central business district of developing proposed outlying retail center]; *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1389, 1393-1394 [EIR analyzed impacts on wildlife of replacing existing farm fields with proposed dairy operation]; cf. 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2008) Significant Environmental Effects, § 13.21, p. 635 (rev. 3.13) [EIR must analyze significant effects of entire project, including phases to be implemented later].)  In such an analysis, the EIR attempts to *predict* the impacts a project would have on the existing environment if approved and implemented. CEQA's wording reflects the fact that projects generally are not yet operating when an EIR is prepared:  an EIR must be prepared for any project "that may have" a significant environmental effect (§ 21100, subd. (a)); the report's purpose is to inform the public and decision makers as to the effects a proposed project "is likely to have" on the environment (§ 21061); and the "environment" referred to is the set of physical conditions in the area "which will be affected" by the project (§ 21060.5).

Second, we note that in appropriate circumstances an existing conditions analysis may take account of environmental conditions that will exist when the project begins operations; the agency is not strictly limited to those prevailing during the period of EIR preparation.  An agency may, where appropriate, adjust its existing conditions baseline to account for a major change in environmental conditions that is expected to occur before project implementation.  In so adjusting its existing conditions baseline, an agency exercises its discretion on how best to define such a baseline under the circumstance of rapidly changing environmental conditions.  (*Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 328.) As we explained in our earlier decision, CEQA imposes no "uniform, inflexible rule for determination of the existing conditions baseline," instead leaving to a

12

sound exercise of agency discretion the exact method of measuring the existing environmental conditions upon which the project will operate.  (*Ibid.*)  Interpreting the statute and regulations in accord with the central purpose of an EIR—"to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment" (§ 21061)—we find nothing precluding an agency from employing, under appropriate factual circumstances, a baseline of conditions expected to obtain at the time the proposed project would go into operation.

For example, in an EIR for a new office building, the analysis of impacts on sunlight and views in the surrounding neighborhood might reasonably take account of a larger tower already under construction on an adjacent site at the time of EIR preparation.  For a large-scale transportation project like that at issue here, to the extent changing background conditions during the project's lengthy approval and construction period are expected to affect the project's likely impacts, the agency has discretion to consider those changing background conditions in formulating its analytical baseline.  Contrary to Justice Baxter's view (conc. & dis. opn. of Baxter, J., *post*, at p. 15), such a date-of-implementation baseline does not share the principal problem presented by a baseline of conditions expected to prevail in the more distant future following years of project operation — it does not omit impacts expected to occur during the project's early period of operation.

Is it ever appropriate for an EIR's significant impacts analysis to use conditions predicted to prevail in the more distant future, well beyond the date the project is expected to begin operation, to the exclusion of an existing conditions baseline?  We conclude agencies do have such discretion.  The key, again, is the EIR's role as an informational document.  To the extent a departure from the "norm[]" of an existing conditions baseline (Guidelines, § 15125(a)) promotes

13

public participation and more informed decisionmaking by providing a more accurate picture of a proposed project's likely impacts, CEQA permits the departure. Thus an agency may forego analysis of a project's impacts on existing environmental conditions if such an analysis would be uninformative or misleading to decision makers and the public.[5]

Parenthetically, we stress that the burden of justification articulated above applies when an agency *substitutes* a future conditions analysis for one based on existing conditions, omitting the latter, and not to an agency's decision to examine project impacts on *both* existing and future conditions. As the *Sunnyvale West* court observed, a project's effects on future conditions are appropriately considered in an EIR's discussion of cumulative effects and in discussion of the no project alternative. (*Sunnyvale West*, *supra*, 190 Cal.App.4th at pp. 1381-1382.)[6]

---

[5] Amicus curiae South Coast Air Quality Management District provides a hypothetical example of factual conditions in which use of an existing conditions baseline would arguably mask potentially significant project impacts that would be revealed by using a future conditions baseline. In this illustration, an existing industrial facility currently emits an air pollutant in the amount of 1,000 pounds per day. By the year 2020, if no new project is undertaken at the facility, emissions of the pollutant are projected to fall to 500 pounds per day due to enforcement of regulations already adopted and to turnover in the facility's vehicle fleet. The operator proposes to use the facility for a new project that will emit 750 pounds per day of the pollutant upon implementation and through at least 2020. An analysis comparing the project's emissions to existing emissions would conclude the project would reduce pollution and thus have no significant adverse impact, while an analysis using a baseline of projected year 2020 conditions would show the project is likely to increase emissions by 250 pounds per day, a (presumably significant) 50 percent increase over baseline conditions.

[6] A cumulative impacts analysis focuses on the effects of the proposed project together with other projects causing related impacts and may rely on projections of future conditions that are expected to contribute to a cumulative adverse effect (Cal. Code Regs., tit. 14, § 15130, subds. (a)(1), (b)), while analysis of the no project alternative includes a discussion of "what would be reasonably

*(footnote continued on next page)*

14

But nothing in CEQA law precludes an agency, as well, from considering both types of baseline—existing and future conditions—in its primary analysis of the project's significant adverse effects. (*Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1573; *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 707.) The need for justification arises when an agency chooses to evaluate *only* the impacts on future conditions, foregoing the existing conditions analysis called for under the CEQA Guidelines.

The need to justify omission of an existing conditions analysis derives in part from the CEQA Guidelines, which clearly establish that the norm for an EIR is analysis against a baseline of existing conditions. In addition to Guidelines section 15125(a), which expressly so provides, the Guidelines provide that an EIR "should normally limit its examination to changes in the *existing* physical conditions in the affected area," considering both direct and indirect effects and "giving due consideration to both the short-term and long-term effects" of the project. (Cal. Code Regs., tit. 14, § 15126.2, subd. (a), italics added.) Moreover, the Guidelines explain that "[t]he no project alternative analysis is not the baseline for determining whether the proposed project's environmental impacts may be significant, unless it is identical to the existing environmental setting analysis which does establish that baseline (see Section 15125)." (Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(1).) While the latter regulation does not absolutely prohibit the use of a future conditions baseline where appropriate, it makes clear that normally the baseline for determining a project's significant adverse impacts is *not*

*(footnote continued from previous page)*

expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services" (Cal. Code Regs., tit. 14, § 15126.6, subd. (e)(2)).

15

the same as the no project alternative, which takes into account future changes in the environment reasonably expected to occur if the project is not approved. (*Id.*, subd. (e)(2), (3)(C).)

The CEQA Guidelines establish the default of an existing conditions baseline even for projects expected to be in operation for many years or decades. That a project will have a long operational life, by itself, does not justify an agency's failing to assess its impacts on existing environmental conditions. For such projects as for others, existing conditions constitute the norm from which a departure must be justified—not only because the CEQA Guidelines so state, but because using existing conditions serves CEQA's goals in important ways.

Even when a project is intended and expected to improve conditions in the long term—20 or 30 years after an EIR is prepared—decision makers and members of the public are entitled under CEQA to know the short- and medium-term environmental costs of achieving that desirable improvement. These costs include not only the impacts involved in constructing the project but also those the project will create during its initial years of operation. Though we might rationally choose to endure short- or medium-term hardship for a long-term, permanent benefit, deciding to make that trade-off requires some knowledge about the severity and duration of the near-term hardship. An EIR stating that in 20 or 30 years the project will improve the environment, but neglecting, without justification, to provide any evaluation of the project's impacts in the meantime, does not "giv[e] due consideration to both the short-term and long-term effects" of the project (Cal. Code Regs., tit. 14, § 15126.2, subd. (a)) and does not serve CEQA's informational purpose well. The omission of an existing conditions analysis must be justified, even if the project is designed to alleviate adverse environmental conditions over the long term.

In addition, existing environmental conditions have the advantage that they can generally be directly measured and need not be projected through a predictive model. However sophisticated and well-designed a model is, its product carries the inherent uncertainty of every long-term prediction, uncertainty that tends to increase with the period of projection. For example, if future population in the project area is projected using an annual growth multiplier, a small error in that multiplier will itself be multiplied and compounded as the projection is pushed further into the future. The public and decision makers are entitled to the most accurate information on project impacts practically possible, and the choice of a baseline must reflect that goal.

Finally, use of existing conditions as a baseline makes the analysis more accessible to decision makers and especially to members of the public, who may be familiar with the existing environment but not technically equipped to assess a projection into the distant future. As an amicus curiae observes, "[a]nyone can review an EIR's discussion of current environmental conditions and determine whether [it] comports with that person's knowledge and experience of the world." But "[i]n a hypothetical future world, the environment is what the statisticians say it is." Quantitative and technical descriptions of environmental conditions have a place in CEQA analysis, but an agency must not create unwarranted barriers to public understanding of the EIR by unnecessarily substituting a baseline of projected future conditions for one based on actual existing conditions. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [EIR allows the public to "know the basis on which its responsible officials either approve or reject environmentally significant action," thereby promoting "informed self-government"].)

Justice Baxter's concurring and dissenting opinion proposes a significantly more lax rule, similar to that espoused by the Court of Appeal below, under which

17

a future conditions baseline may be employed, in lieu of one based on existing environmental conditions, so long as it is "a realistic measure of the physical conditions without the proposed project" projected at the agency's chosen future date. (Conc. & dis. opn. of Baxter, J, *post*, at p. 7.) As discussed earlier, such a rule cannot be derived from *Communities for a Better Environment* or the other authority cited for it. Moreover, it would drain Guidelines section 15125(a)'s last sentence (providing that existing environmental conditions "will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant") of virtually all prescriptive effect. Perhaps most important, it would sanction the unwarranted omission of information on years or decades of a project's environmental impacts and open the door to gamesmanship in the choice of baselines.

Under the rule proposed in Justice Baxter's opinion, agencies evaluating projects intended to exist and operate for many decades could seemingly choose a baseline of conditions from *any* period of the project's expected operations, 15, 30 or 60 years in the future, so long as the agency's projections were supported by reasonably reliable data and predictive modeling. Existing environmental conditions would constitute the "normal[]" baseline for an EIR (Guidelines § 15125(a))—*except* for any case where the agency chose a different baseline. Agencies would be empowered routinely to omit discussion of short- and medium-term operational effects, preparing EIRs that told the public and decision makers only what impacts could be expected decades down the road. An agency that wished to hide significant adverse impacts expected to occur in the project's initial years of operation could choose to analyze the project's environmental effects only at some more distant period, when changes in background conditions might mask or swamp the adverse effects seen in the shorter term. That no intentional hiding of likely impacts appears in this case does not negate the potential for

18

manipulation of the baseline under a rule that provides agencies unbounded discretion in the choice.

Contrary to Justice Baxter's claim, our holding here does not impose any "wasteful" or "additional" substantive requirement on agencies. (Conc. & dis. opn. of Baxter, J., *post*, at p. 18.) We hold only that agencies normally must do what Guidelines section 15125(a) expressly requires — compare the project's impacts to existing environmental conditions, as that term is broadly understood, to determine their significance. The question we would have an agency ask in choosing a baseline is not, "Would an existing conditions analysis *add* information to a future conditions analysis?" It is, "Do we have a reason to *omit* the existing conditions analysis and substitute one based on future conditions?" Of course, where an agency concludes an analysis of impacts on future conditions is also needed in any portion of the EIR, it may include such an analysis. But any duplication of effort therein involved is not a product of this decision.

For all these reasons, we hold that while an agency preparing an EIR does have discretion to omit an analysis of the project's significant impacts on existing environmental conditions and substitute a baseline consisting of environmental conditions projected to exist in the future, the agency must justify its decision by showing an existing conditions analysis would be misleading or without informational value. *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council*, *supra*, 190 Cal.App.4th 1351, and *Madera Oversight Coalition, Inc. v. County of Madera*, *supra*, 199 Cal.App.4th 48, are disapproved insofar as they hold an agency may never employ predicted future conditions as the sole baseline for analysis of a project's environmental impacts.

Because the standard articulated here involves a primarily factual assessment, the agency's determination is reviewed only for substantial evidence supporting it. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of*

*Rancho Cordova*, *supra*, 40 Cal.4th at p. 435.) If substantial evidence supports an agency's determination that an existing conditions impacts analysis would provide little or no relevant information or would be misleading as to the project's true impacts, a reviewing court may not substitute its own judgment on this point for that of the agency. (*Ibid.*)

### B. The Expo Authority's Use of a Year 2030 Baseline

#### 1. Traffic congestion analysis

As proposed in the EIR, the Expo Phase 2 project will cross several streets at grade rather than with bridges or tunnels. To analyze the resulting impacts on traffic congestion, the Expo Authority used the following method:

(1) For numerous street intersections in the vicinity, the agency directly observed existing congestion in 2007-2008, measuring it as the average delay in travel through each intersection during the morning and afternoon peak travel periods. The delay was expressed in terms of "Level of Service" (LOS), ranging from LOS A (free flow) to LOS F (extreme congestion).[7]

(2) Using MTA's traffic projection model, which incorporates regional growth projections from the Southern California Association of Governments, the Expo Authority predicted the LOS for each intersection in the year 2030 if the Expo Phase 2 project is *not* built (and assuming no other transit improvements along the project corridor).

---

[7] For signalized intersections, delay at LOS A is less than or equal to 10 seconds, at LOS B it is between 10 and 20 seconds, at LOS C it is between 20 and 35 seconds, at LOS D it is between 35 and 55 seconds, at LOS E it is between 55 and 80 seconds, and at LOS F it is greater than 80 seconds. The LOS thresholds are lower for unsignalized intersections.

20

(3) For each intersection studied, the Expo Authority then predicted the LOS in the year 2030 if the Expo Phase 2 project *is* built and operated.  These projections took into account automobile trip reductions expected to result from the project and additional peak hour trips to drop off or pick up passengers at stations, as well as the impact of stoppages at grade crossings as each train passes.

(4) For each intersection, the predicted year 2030 LOS with the project was compared to the predicted year 2030 LOS without the project and the significance of any impact assessed.  An adverse impact on delay was considered significant if the project was projected to cause service to deteriorate from LOS A, B, C, or D to LOS E or F or, for those intersections projected to be at LOS E or F in 2030 without the project, if the project would increase delay by four seconds or more.

Using this method, the EIR projects some additional local traffic congestion in 2030 due to the project, but none rising above the significance thresholds just described.  For example, at the intersection of Stewart Street and Olympic Boulevard, vehicles in the year 2030 are expected to experience a morning peak period delay of 34.2 seconds absent the project and 49.0 seconds with the project, but this 14.8-second increase in delay is not considered significant because it only moves the intersection from LOS C to LOS D, and not into the unsatisfactory categories of LOS E and F.  At 20th Street and Olympic Boulevard, the project is expected to cause an additional 0.8 seconds of delay, considered insignificant because it does not change the projected LOS, which is expected to be unsatisfactory (LOS E) in 2030 even without the project, and falls below the four-second significance threshold.  Several other intersections fit these patterns of insignificant adverse impact, while at many other intersections the project is projected to *reduce* traffic delay in 2030, due in part to intersection improvements proposed in conjunction with the transit line.

21

### 2. *Air pollution analysis*

Based on projections of an increase in vehicle miles traveled in the region, the EIR predicts an increase in air pollution emissions by 2030 if the Expo Phase 2 project is not built. The project would result in fewer vehicle miles traveled, in comparison to the no-build alternative, and hence in fewer emissions in 2030. By reducing vehicle travel and the resulting emissions below those otherwise expected, project implementation "would have a beneficial impact on regional pollutant levels over the life of the project . . . ."

### 3. *Explanation of baseline choice*

In the introduction to the EIR's factual findings, the Expo Authority explains that it found use of a future conditions baseline for traffic and air quality impacts analysis necessary "so that the public and the decision makers may understand the future impacts on traffic and air quality of approving and not approving the project." The EIR continues: "The evaluation of future traffic and air quality conditions utilizes adopted official demographic and [*sic*] projections for the project area and region. Past experience with the adopted demographic projections indicate that it is reasonable to assume that the population of the project area and the region will continue to increase over the life of the project. The projected population increases will, in turn, result in increased traffic congestion and increased air emissions from mobile sources in the project area and in the region. [¶] For most of the environmental topics in the [EIR] and in these Findings, the Authority finds that existing environmental conditions are the appropriate baseline condition for the purpose of determining whether an impact is significant. However, the Authority finds that the existing physical environmental conditions (current population and traffic levels) do not provide a reasonable baseline for the purpose of determining whether traffic and air quality impacts of the Project are significant. The Authority is electing to utilize the future baseline

conditions for the purposes of determining the significance of impacts to traffic and air quality."

Further explanation of the baseline choice is provided in a later section on the EIR's methods for determining impacts: "A transportation project includes significant capital infrastructure and is intended to meet long-term needs. As a result, the permanent effects of those transportation projects are, and should be, evaluated based on a longer-term perspective that takes increases in population and programmed changes to the transportation system into account. Since the project is addressing both existing and long-term transportation shortfalls, that longer-term perspective should include reasonably foreseeable other improvements. [¶] For this project the long-term permanent impacts are evaluated against what is [*sic*] expected to be existing conditions in 2030. This assumes the planned growth (jobs and employment) and related funded transportation improvements as proposed in the [Southern California Association of Governments Regional Transportation Plan]. In addition, short-term impacts associated with the construction period (2011 to 2015) of the project have also been evaluated. [¶] . . . Because population and traffic are anticipated to increase over the life of the project, this approach provides the public and decision makers with a realistic evaluation of the significance of air quality and traffic impacts over the life of the project."

The Expo Authority's explanation of its baseline choice in its briefing places similar reliance on the inevitability of population and traffic growth in the project area: "It is undisputed that the population, employment and concomitant traffic congestion will continue to increase through 2030 on the west side. [Citation.] It is absurd to suggest that the Authority use 2007 population, employment and traffic to determine the Project's operational impacts when the 2007 conditions will no longer exist when the Project is fully operational."

23

### *4. Propriety of baseline choice*

We discern no substantial evidence supporting the Expo Authority's decision to omit an analysis of the project's traffic and air quality impacts on existing environmental conditions. Although the agency did not expressly find an existing conditions analysis would have been misleading or without informational value, its finding that for analysis of traffic congestion and air pollution impacts "existing physical environmental conditions . . . do not provide a reasonable baseline" may be construed as so asserting. Unfortunately, nothing in the record supports that determination, and without such evidence the Expo Authority cannot justify its decision to completely omit an analysis of the project's impacts on existing traffic congestion and air quality.

The Expo Authority observes that "2007 conditions will no longer exist when the Project is fully operational." As discussed earlier, CEQA allows an agency to adjust its existing conditions baseline to account for an important change that will occur between the time an EIR is prepared and the time of project implementation. (See pt. I.A., *ante*.) But the Expo Authority did not measure traffic congestion and air pollution impacts against existing environmental conditions when the project begins operations. The agency used *no* existing conditions baseline, adjusted or unadjusted, for analysis of these impacts, instead employing *only* a baseline of projected 2030 conditions.

That the Expo Phase 2 project is "intended to meet long-term needs" for public transportation is an insufficient justification. By focusing solely on the project's operational impacts in the distant future, the EIR neglects to inform the public and decision makers explicitly of any operational impacts that could occur in the project's first 15 years of operation. (The only short-term impacts on traffic and air quality analyzed were those resulting from the project's *construction*.) The absence of such "due consideration to both the short-term and long-term effects"

24

of the project (Cal. Code Regs., tit. 14, § 15126.2, subd. (a)) threatens to deprive the EIR's users of the opportunity to weigh the project's environmental costs and benefits in an informed manner.

Similarly, that project area population, traffic, and emissions of air pollutants are expected to continue increasing through and beyond 2030 does not justify the agency's failure to analyze operational impacts under earlier conditions. The expectation of change may make it important for the agency to *also* examine impacts under future conditions (whether in the significant impacts analysis, the cumulative impacts analysis, or the discussion of the no project alternative), but it does not constitute substantial evidence supporting a determination that an existing conditions analysis would be uninformative or misleading.

Nor does the fact ridership is not expected to reach maximum levels immediately upon the transit line's opening constitute substantial evidence justifying the failure to examine impacts on existing conditions.[8] The level of ridership on the proposed transit line is a characteristic of the *project in operation*, not a characteristic of the *environmental baseline* against which project impacts are measured. As noted earlier, an existing conditions analysis often assumes the

---

[8] The record does not indicate full ridership will first be achieved in 2030. The passage cited in the Expo Authority's brief, found in the EIR's discussion of parking impacts and mitigation along Colorado Avenue, reads as follows: "On opening day, 71 to 92 percent of the 2030 parking demand would be provided depending on the Preferred Alternative selected. This would be reasonably consistent with opening day ridership, which is estimated at approximately 77 percent of the year 2030 forecasts." While this makes clear ridership on opening day is expected to be below its ultimate maximum, it does not purport to predict how fast ridership will increase or when it will reach its full level, other than assuming that level will be reached by or before the year 2030. From common experience, one might expect fewer than 15 years will be needed for commuters to start using a new transit line.

25

project exists and is in full operation at the time the environmental analysis is conducted, measuring the likely impacts against a baseline of conditions existing at the time of environmental analysis. Thus the Expo Authority did not need to employ a baseline of predicted 2030 background conditions in order to measure the impacts of full ridership; those likely impacts could have been predicted against an existing conditions baseline. Justice Baxter's concurring and dissenting opinion, in suggesting the year 2030 baseline was chosen as representative of full ridership, ignores the fact that ridership is not a baseline condition but a characteristic of the project's operations. (Conc. & dis. opn. of Baxter, J., *post*, at p. 11.) In any event, neither the EIR, nor the Expo Authority's briefs, nor Justice Baxter's opinion explain whether ridership levels would affect the project's impacts on traffic congestion and air pollution, and if so, whether the effect would be positive or negative; the likelihood of changing ridership levels thus cannot be considered substantial evidence an existing conditions analysis—whatever ridership level it assumed—would be useless or misleading.

In its brief, the Expo Authority states it "chose 2030 because when it issued the [notice of preparation of the EIR] in 2007, 2030 was the planning horizon for transportation projects in the adopted [Southern California Association of Governments] Regional Transportation Plan," and asserts that federal law requires the use of this long-term perspective in planning for federally funded transportation projects. To the extent the agency is arguing that a technique used for planning under another statutory scheme necessarily satisfies CEQA's requirements for analysis of a project's impacts, we disagree. Except where CEQA or the CEQA Guidelines tie CEQA analysis to planning done for a different purpose (see, e.g., § 21081.2, subd. (a) [CEQA findings on traffic impacts not required for certain residential infill projects that are in compliance with other municipal plans and ordinances]), an EIR must be judged on its

26

fulfillment of CEQA's mandates, not those of other statutes. And while we try to interpret CEQA in a manner consistent with other planning schemes (see *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*, *supra*, 40 Cal.4th at pp. 432-434), no issue of conflict or incompatibility arises here. Nothing prevents an agency preparing an EIR from analyzing the impacts of a project against an existing conditions baseline even if the agency has also planned under other statutes for the project's long-term operation. Moreover, the use of multiple baselines for direct impacts analysis does not violate CEQA (see *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1573; *Woodward Park Homeowners Assn., Inc. v. City of Fresno*, *supra*, 150 Cal.App.4th at p. 707), and even when the EIR uses solely an existing conditions baseline for direct impacts analysis, available information about the longer term impacts of the project, together with other foreseeable developments, is appropriately incorporated into the EIR under the rubric of a cumulative impacts analysis (Cal. Code Regs., tit. 14, § 15130). There is thus no necessary connection between use of a year 2030 horizon for transportation planning generally and the agency's choice of conditions in that year as the sole baseline for project impacts analysis under CEQA.

In summary, the administrative record does not offer substantial evidence to support the Expo Authority's decision to limit its analysis of project impacts on traffic congestion and air quality to predicted impacts in the year 2030, to the exclusion of likely impacts on conditions existing when the EIR was prepared or when the project begins operation.

### 5. *Prejudice*

An omission in an EIR's significant impacts analysis is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts. Although an agency's failure to

27

disclose information called for by CEQA may be prejudicial "regardless of whether a different outcome would have resulted if the public agency had complied" with the law (§ 21005, subd. (a)), under CEQA "there is no presumption that error is prejudicial" (*id.*, subd. (b)). Insubstantial or merely technical omissions are not grounds for relief. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at pp. 485-486.) "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712.)

With regard to the analysis of Expo Phase 2's traffic congestion impacts, we conclude the EIR's use exclusively of a future conditions baseline had no such prejudicial effect. Although the EIR failed to analyze the project's impacts on existing traffic congestion, it did include an extensive analysis of year 2030 congestion effects, finding no significant adverse impacts. That detailed analysis demonstrates the lack of grounds to suppose the same analysis performed against existing traffic conditions would have produced any substantially different information.

The EIR revealed that project impacts on congestion at intersections along the chosen rail route are expected in most cases to be *favorable* in 2030, that most of the adverse impacts expected are small, and that even the few relatively large adverse impacts expected would not, if applied to existing conditions, result in significant changes in delay status.[9] Although Neighbors has argued that

---

[9] For the majority of the more than 100 intersection/peak period combinations studied, the project's expected impact in 2030 is favorable or nonexistent. Where the predicted impact is adverse, it is generally minor,

*(footnote continued on next page)*

28

intersections expected to reach unsatisfactory status by 2030 without the project might do so earlier because of project impacts, the EIR showed that those intersections would experience favorable, or in one instance adverse but very minor, impacts in 2030 due to the project.[10] Design changes reducing delay are built into the project at many intersections, and the expected gradual increase in traffic generally could not reasonably be thought likely to result in substantially larger project impacts on congestion under existing conditions than under 2030 conditions.[11] In these particular factual circumstances, the EIR's omission did not

*(footnote continued from previous page)*

exceeding 10 seconds in only seven instances. And of the 10 currently satisfactory intersections (those in LOS status A through D) on which the rail project is expected to have the greatest adverse impacts in 2030, including the seven on which the projected 2030 impact exceeds 10 seconds, *none* are currently close enough to LOS E so that the 2030 impact, if applied to existing conditions, would put the intersection into unsatisfactory status. Only two currently satisfactory intersections are within 10 seconds of the LOS E threshold, and the project is projected to affect delay *favorably* at both.

[10]     Five intersection/peak period combinations along the proposed transit line meet the criteria of being currently in a satisfactory LOS and projected to turn unsatisfactory by 2030 in the project's absence. For four of the five, the project's 2030 impact on congestion is expected to be favorable, reducing delay in amounts ranging from 1.1 seconds to 30.1 seconds. The single projected adverse impact in this group is very small, 0.8 seconds. And since the existing morning peak delay at that intersection (20th Street and Olympic Boulevard) is 42.6 seconds, the adverse project impact under existing conditions would have to be 12.4 seconds, or more than 15 times the adverse impact in 2030, to put the intersection over the 55-second threshold into LOS E. To posit such an extreme difference in impacts would be unsupported speculation.

[11]     The record shows that, baseline conditions aside, the project's *operations* may differ somewhat on opening day from later periods, in that ridership on the transit line is expected initially to be only 77 percent of its eventual level. As noted earlier, however, an existing conditions impacts analysis ordinarily assumes, counterfactually, that the project is in full operation. And even if an existing conditions analysis assumed 77 percent ridership, no substantial difference in impacts would be likely. The rail project's favorable effect on project area traffic

*(footnote continued on next page)*

"preclude[] informed decisionmaking and informed public participation." (*Kings County Farm Bureau v. City of Hanford*, *supra*, 221 Cal.App.3d at p. 712.)

We reach the same conclusion as to the analysis of air quality impacts. Based on the prediction that operation of the Expo Phase 2 project would reduce the vehicle miles traveled in the project area and hence reduce emissions of pollutants, the EIR concluded project implementation "would have a beneficial impact on regional pollutant levels over the life of the project . . . ." But the project will begin reducing vehicle miles travelled as soon as it starts operating, as some of those who would otherwise drive decide to take the new train. Under the EIR's logic, to which Neighbors raises no objection other than the choice of a baseline, the project's impact on air quality will thus be beneficial *throughout* its operation, not only in 2030. The EIR's formal use of a year 2030 baseline for this analysis was thus an insubstantial, technical error that cannot be considered prejudicial. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at pp. 486-488.)

To comply fully with CEQA's informational mandate, the Expo Authority should have analyzed the project's effects on existing traffic congestion and air quality conditions. Under the specific circumstances of this case, however, its failure to do so did not deprive agency decision makers or the public of substantial information relevant to approving the project, and is therefore not a ground for setting that decision aside.

---

*(footnote continued from previous page)*

is projected to be modest even at full ridership: a reduction of 0.38 percent in vehicle miles traveled in 2030. Even if the 77 percent initial ridership implies that initially the project will reduce vehicle miles traveled only by 0.29 percent, there are no grounds to believe such an extremely minor difference (0.09 percent) could substantially alter the project impacts on existing congestion at the individual intersections studied.

## II. Adequacy of Mitigation Measure for Spillover Parking Effects

As proposed in the EIR, the Expo Phase 2 project does not include construction of parking facilities at several stations. The EIR recognizes that some transit patrons will nevertheless attempt to park near these stations, and near-station streets where parking is neither time limited nor restricted to those with residential permits "could be impacted by spillover parking." To mitigate this potential impact, the EIR proposed, and the agency adopted, a series of measures. On-street parking in areas where spillover effects are anticipated will be monitored before and for six months after the opening of the transit line. If a parking shortage results, MTA will help the responsible local jurisdiction establish an appropriate permit parking program, for which MTA will pay the signage and administrative costs. If a permit program is inappropriate for the area, MTA "will work with the local jurisdictions" to decide on another option, such as time-restricted, metered, or shared parking arrangements. By means of this mitigation measure, the EIR concludes, any adverse spillover parking effect will be rendered less than significant.

Neighbors contends this mitigation measure is insufficiently enforceable because it depends on the cooperation of municipal agencies having jurisdiction over parking in the vicinity of the stations. CEQA, however, allows an agency to approve or carry out a project with potential adverse impacts if binding mitigation measures have been "required in, or incorporated into" the project *or* if "[t]hose changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency." (§ 21081, subd. (a); see Cal. Code Regs., tit. 14, § 15091, subd. (b) [findings to this effect "shall be supported by substantial evidence in the record"].) The Expo Authority made both findings as to its spillover parking mitigation measure, and both findings are supported by substantial evidence.

31

Under the adopted mitigation measure, MTA is *required* to monitor parking in the potentially affected neighborhoods, to pay for a residential permit parking program where station spillover has resulted in a street parking shortage, and to assist in developing other measures where a residential permit program is inappropriate. But as MTA cannot institute street parking restrictions without the cooperation of the local municipalities, some part of the mitigation, to the extent it is needed, will indeed be the responsibility of other public agencies, which "can and should" (§ 21081, subd. (a)(2)) adopt parking programs and restrictions to alleviate pressure from commuters using the new transit line.

Neighbors relies on *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1260-1262, in which the appellate court found a city's proposed measures to mitigate the transportation impacts of a general plan framework were inadequate. The transportation plan involved in that case, however, was designed to mitigate the effects of massive population and employment growth planned for the city and would have required $12 billion from various sources, of which the city's own portion far exceeded its available funds. (*Id.* at p. 1256.) The city thus "acknowledged in the [mitigation plan] that there was great uncertainty as to whether the mitigation measures would ever be funded or implemented" (*id.* at p. 1261), leading the court to find no substantial evidence that enforceable mitigation measures had been incorporated into or were required by the project.

The circumstances in *Federation of Hillside & Canyon Associations* are not comparable to those here, where the mitigation measure at issue involves only the monitoring of parking near several transit stations and, if a shortage develops, the cooperative implementation of one or more relatively low-cost solutions. While the Expo Authority and MTA cannot guarantee local governments will cooperate to implement permit parking programs or other parking restrictions, the record

32

supports the conclusion these municipalities "can and should" (§ 21081, subd. (a)(2)) do so.  Neighbors's speculation a municipality might not agree to a permit parking program—which MTA would pay for and which would benefit the municipality's own residents—is not sufficient to show the agency violated CEQA by adopting this mitigation measure.  (See *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 364-365 [the finding that mitigation through sharing the cost of necessary improvements with the responsible agency is infeasible was not justified by speculation that the agency might not agree to undertake the improvements].)

**DISPOSITION**

The judgment of the Court of Appeal is affirmed.

**WERDEGAR, J.**

**WE CONCUR:**

**KENNARD, J.**
**CORRIGAN, J.**

33

**CONCURRING AND DISSENTING OPINION BY BAXTER, J.**


Enacted by the Legislature in 1970, the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.) aims to enhance the environmental quality of the state and promote long-term protection of the environment.  (§ 21001.)  To achieve these objectives, CEQA establishes a comprehensive review process for analyzing the potential environmental impacts of a proposed project and assessing how such impacts might be mitigated. Inasmuch as the review process can be quite lengthy and involved, the Legislature has declared it our state policy that the public agencies responsible for carrying out the process must do so "in the most efficient, expeditious manner," so as to conserve the available financial, governmental, and other resources for application toward mitigation efforts.  (§ 21003, subd. (f).)  It is also the Legislature's intent that courts "shall not" interpret the statutory and regulatory requirements of CEQA "in a manner which imposes procedural or substantive requirements beyond those explicitly stated in [CEQA] or in the state guidelines."  (§ 21083.1.)

---

[1]     All further statutory references are to this code unless otherwise indicated.

1

The majority's analysis of the baseline issue fails to honor these legislative prerogatives.[2]  The upshot of that analysis is this:  An environmental impact report (EIR) may omit an analysis of a proposed project's impacts on existing conditions *only when* its inclusion "would detract from [the] EIR's effectiveness as an informational document."  (Lead opn., *ante*, at p. 11.)  The majority's categorical rule means that, notwithstanding the particular nature and circumstances of a proposed project, a lead agency abuses its discretion when it evaluates environmental impacts with a baseline of projected future conditions in lieu of an existing conditions baseline, even though selection of the former is reasonable under the circumstances and substantial evidence supports the analysis.  In short, even if an EIR's analysis of impacts using a future conditions baseline, standing alone, would provide a realistic measure of a project's impacts that allows for informed decisionmaking and public participation, the majority mandates that the EIR also undertake and include an existing conditions analysis, so long as such an analysis would not in fact diminish the effectiveness of the document.  (Lead opn., *ante*, at p. 11.)

Although it is easy to see the wastefulness of requiring an existing conditions analysis when a future conditions analysis provides a realistic assessment of a project's significant adverse effects, there are several legal reasons why the majority's holding is in error.  Most notably, the majority's restrictions on agency discretion find no support in CEQA or in the regulations promulgated thereunder.  (See pt. II.A., *post*.)  In addition, the restrictions are contrary to our

---

[2]      I use the term "majority" to refer to those portions of the lead opinion's analysis in which Justice Liu concurs.  (See conc. & dis. opn. of Liu, J., *post*, at pp. 1-3, 5.)

2

decisions recognizing an agency's discretion in selecting a baseline and case law requiring deferential review of agency decisions. (See *ibid*.)

Apart from these legal defects, the majority's analysis is objectionable for the further reason that it adds a significant level of complexity and uncertainty to an already arduous environmental review process. To begin with, the stated restrictions are ambiguous and create opportunities for litigation over their applicability. Moreover, the ease of alleging an abuse of discretion under the majority's analysis is likely to prompt challenges whenever an existing conditions baseline is omitted, causing delays that may add significantly to a project's costs or derail it altogether. (See pt. II.B., *post*.) The mere threat of such challenges may prompt lead agencies to engage in existing conditions analyses as a matter of course, even if such exercises would not materially improve public disclosure or informed decisionmaking, and this despite the declared state policy requiring that the review process be conducted efficiently and expeditiously in order to conserve financial and governmental resources. (See *ibid*.) That the majority needlessly complicates and protracts the CEQA review process is most unfortunate, for both the public and the environment.

In sum, I concur in the ultimate affirmance of the Court of Appeal judgment, which upheld certification of the EIR for the proposed light rail project at issue (Expo Phase 2). I also concur in the majority's rejection of the spillover parking contentions of plaintiff Neighbors for Smart Rail (Neighbors). But I dissent from the majority's analysis of the baseline issue and its conclusion that the lead agency (Expo Authority) abused its discretion in approving the EIR's use of an analytic baseline of traffic and air quality conditions projected to exist in the year 2030 (the 2030 baseline), in lieu of a baseline of the conditions existing in 2007 when the notice of preparation of the EIR was published.

3

As a major infrastructure project designed specifically to address projected long-term increases in traffic congestion and air pollution, Expo Phase 2's very operation will, over time, achieve environmental objectives and efficiencies in complete alignment with CEQA's goals of enhancing and protecting the environment in this state. The majority does not disagree that the traffic and air quality conditions in 2007 will no longer exist when Expo Phase 2 is fully operational. But despite Expo Authority's reliance on this reality as a justification for omitting an impacts analysis based on the 2007 conditions, the majority proceeds to fault the agency for failing to analyze the conditions projected to exist eight years after that date, when Expo Phase 2 is scheduled to begin operations in 2015. (See lead opn., *ante*, at pp. 24, 27.) The unfairness of today's decision is stunning: the majority finds an abuse of discretion based on the lead agency's failure to use a baseline that is nowhere mentioned in the CEQA statutes, regulations, or case law, and that no agency or member of the public ever advocated in the administrative review process below.

Unlike the majority, I conclude, consistent with the statutory and decisional law governing review in CEQA proceedings, that the record amply supports Expo Authority's use of the 2030 baseline in place of an existing conditions baseline. (See pt. I., *post*.) The record also confirms that substantial evidence supports the 2030 baseline as a realistic baseline for measuring the project's operational impacts on traffic and air quality conditions. (*Ibid*.)

## I.

The basic purpose of an EIR is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061; see also § 21002.1, subd. (a).) CEQA defines a "significant effect on

4

the environment" as meaning "a substantial, or potentially substantial, adverse change in the environment." (§ 21068.)

In order to provide meaningful information to the decision makers and the public, an EIR must clearly and accurately identify the effects of the proposed project as distinguished from nonproject effects. To determine if a project is likely to have a significant effect on the environment, the lead agency "must use some measure of the environment's state absent the project." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 (*Communities for a Better Environment*).) The "environment" means the physical conditions existing within the area "which will be affected by a proposed project." (§ 21060.5.)

As relevant here, "[a]n EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will *normally* constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Cal. Code Regs., tit. 14, § 15125, subd. (a), italics added;[3] see also Guidelines, § 15126.2, subd. (a).) In using the word "normally," Guidelines section 15125, subdivision (a) (Guidelines section 15125(a)), "necessarily contemplates" that physical conditions at a point in time other than the two specified may constitute the appropriate baseline or environmental setting.

---

[3]    Henceforth, all references to "Guidelines" are to the CEQA Guidelines in title 14 of the California Code of Regulations.

5

(*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190
Cal.App.4th 316, 336 (*Cherry Valley*).)

In *Communities for a Better Environment*, we emphasized that " 'the date
for establishing a baseline cannot be a rigid one.  Environmental conditions may
vary from year to year and in some cases it is necessary to consider conditions
over a range of time periods.' " (*Communities for a Better Environment*, *supra*, 48
Cal.4th at pp. 327-328.)  An agency's selection of a baseline is, fundamentally, a
factual determination of how to realistically measure the physical conditions
without the proposed project.  (*Id.* at p. 328; see *Cherry Valley*, *supra*,
190 Cal.App.4th at pp. 336-337.)  Although *Communities for a Better
Environment* did not approve the use of projected future conditions as the sole
baseline for evaluating environmental impacts, neither did it prohibit such use or
otherwise impose restrictions on an agency's discretion to omit an existing
conditions baseline.[4]  This should be obvious from the fact that the decision is the
only support the majority cites for its purported holding that an agency may base
an EIR's impacts analysis exclusively on the conditions "*expected* to obtain" —
i.e., *projected* to obtain — when a proposed project begins operating.  (Lead opn.,
*ante*, at pp. 12-13, italics added; see pt. II.B., *post*.)  The important takeaway from
*Communities for a Better Environment* is our recognition that, while flexibility in
establishing a baseline must be allowed, the selected baseline must result in a
reliable evaluation of a project's impacts.

---

[4]     As the majority acknowledges, to the extent Court of Appeal decisions have
held or suggested that sole use of a projected future conditions baseline is
forbidden, they are wrong.  (E.g., *Pfeiffer v. City of Sunnyvale City Council* (2011)
200 Cal.App.4th 1552; *Madera Oversight Coalition, Inc. v. County of Madera*
(2011) 199 Cal.App.4th 48; *Sunnyvale West Neighborhood Assn. v. City of
Sunnyvale City Council* (2010) 190 Cal.App.4th 1351.)

Generally, an abuse of discretion is established under CEQA "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Because the language of Guidelines section 15125(a) clearly contemplates that an agency may depart from the norm of an existing conditions analysis, the proper inquiry is whether the agency acted reasonably given the nature and circumstances of the project, and whether substantial evidence supports its selected alternative baseline as a realistic measure of the physical conditions without the proposed project that provides an impacts analysis allowing for informed decisionmaking and public participation. (§ 21168.5; see *Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 315, 322.) A reviewing court will "indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 (*Save Our Peninsula*).)

"[A]s with all CEQA factual determinations," the selection of a baseline is a discretionary determination reviewed "for support by substantial evidence." (*Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 328; see *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1278 [decision not to deviate from the norm also reviewed for substantial evidence].) Substantial evidence supporting a predicted baseline may consist of reasonable assumptions and expert evaluations that are supported by facts. (§ 21080, subd. (e)(1); Guidelines, § 15384, subd. (b); see *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 371-372; *Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 120.) The requirement that an agency's decision be supported by substantial evidence helps to ensure that a particular baseline will not

7

be selected unless there is evidence of a solid and credible nature warranting its use.

During the lengthy administrative review process here, plaintiff Neighbors complained the EIR should have used a baseline of projected conditions in the year 2035 to allow for a proper evaluation of traffic congestion and air quality impacts. In filing this lawsuit, however, Neighbors switched tactics and now claims the EIR is deficient in failing to use the regulatory baseline norm of the physical conditions existing "at the time the notice of preparation is published" (Guidelines, § 15125(a)), namely, a 2007 baseline. No deficiency appears.

The EIR explicitly states that Expo Phase 2 is designed, inter alia, to "provide high-capacity transit service," to "[a]ccommodate existing population and employment growth and transit-supportive land use densities," to "[p]rovide an effective transit alternative to the current and expected increase in roadway congestion in the corridor," and to "[r]ealize environmental benefits associated with increased transit usage, such as improved air quality and energy efficiencies." Thus, unlike projects that are industrial or commercial in nature, Expo Phase 2 was conceived specifically to alleviate traffic congestion and improve air quality in full alignment with CEQA's objectives to enhance environmental quality and promote long-term protection of the environment. (See § 21001; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.)

As pertinent here, the EIR presented and relied upon state-of-the-art forecasting models that accounted for existing traffic conditions, approved population and employment growth projections, and resulting changes in traffic. These models project, among other things, that between 2005 and 2030, daily vehicle miles traveled within the study area will increase by 27 percent (31 percent to 32 percent during peak hours), and daily vehicle hours will increase by 74 percent (93 percent to 105 percent during peak hours). In light of this and other

8

data, including the forecast that the transit system's opening day ridership in 2015 will be only 77 percent of the ridership in 2030, Expo Authority approved the EIR's exclusive use of a 2030 baseline to evaluate the traffic and air quality impacts that would be associated with the system's usage at that time.[5]

Significantly, no one here disputes the validity of the forecasting models and data used to project the physical conditions in 2030 or the accuracy of the EIR's analysis of the transit system's operational impacts using the 2030 baseline. As the EIR reflects, it evaluated the system's impacts on traffic utilizing an independently developed forecasting model[6] that has been subjected to extensive peer review and certified by the Federal Transit Administration for use in environmental documents. Notably, the model was updated and refined specifically for use in the EIR, in close coordination with that federal agency.

Likewise, there is no evidence that the 2030 baseline was selected to manipulate the analysis of traffic congestion and air quality impacts. As even

[5] Consistent with CEQA requirements, Expo Authority reviewed the EIR at issue and approved its evaluation of Expo Phase 2's potential impacts and possible alternatives with an *existing* conditions baseline on all other environmental topics, including the impacts during the projected four-year construction period (2011-2015). (Guidelines, § 15125(a).) These topics included visual quality (aesthetics), biological resources (vegetation and wildlife), cultural resources (including archaeological and historical resources), paleontological resources, geology, soils, and seismicity, hydrology and water quality, land use and planning, noise and vibration, parks and community facilities, safety and security (including delay of emergency service vehicles when waiting for light rail vehicles to cross an intersection), socioeconomics (including potential displacement and relocation of housing, residents, and businesses), and energy resources. Expo Authority also reviewed the potential hazardous materials or conditions that could be encountered, given the existing conditions.

[6] The Los Angeles County Metropolitan Transit Authority developed the model with data inputs from a regional travel demand model developed by the Southern California Association of Governments.

Justice Werdegar acknowledges, use of the 2030 baseline resulted in an "extensive" and "detailed" analysis that demonstrates no grounds "to suppose the same analysis performed against existing traffic [and air quality] conditions would have produced any substantially different information." (Lead opn., *ante*, at p. 28.)

Indulging all reasonable inferences from the evidence that support Expo Authority's determinations and resolving all evidentiary conflicts in favor of its decision (*Save Our Peninsula Committee*, *supra*, 87 Cal.App.4th at p. 117), and for the reasons below, I conclude the agency did not abuse its discretion in forgoing an existing conditions baseline in favor of a 2030 baseline to measure Expo Phase 2's operational impacts.

Expo Phase 2 was specifically designed to alleviate expected increases in "roadway congestion" and to "realize environmental benefits . . . such as improved air quality" based on a 2030 transit planning horizon. Accordingly, Expo Authority could reasonably decide that an evaluation of the environmental conditions with and without the transit system in the year 2030, when the system will actually be operating, will allow for a meaningful understanding of its operational impacts on traffic and air quality. Certainly, the fact that state-of-the-art forecasting models predict substantial increases in the percentages of daily vehicle miles and vehicle hours from 2005 to 2030 provides ample basis for the agency's decision to dispense with an analysis based on 2007 traffic conditions which will no longer exist when the system is in operation. Given the uncontroverted expert projections showing that traffic conditions and congestion at the studied intersections will be worse in 2030 than in 2005 (and in 2007), it stands to reason that analyzing the system's operational impacts under the more congested conditions of 2030 is not only realistic, but yields a more environmentally rigorous measure of such impacts than an analysis based on the

10

outdated and less congested conditions existing in 2007.  Selecting the 2030 planning horizon as representative of operational conditions is logical for the additional reason that, despite the system's anticipated opening date of 2015, ridership at that point is projected to be at only 77 percent of the capacity anticipated in 2030.

Moreover, as the validity of the forecasting models and the accuracy of the projected future conditions are not even in dispute, there can be no question that substantial evidence supported Expo Authority's predicted baseline.  (Guidelines, § 15384, subd. (b); see *Eureka Citizens for Responsible Government v. City of Eureka*, *supra*, 147 Cal.App.4th at pp. 371-372; *Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 120.)  Indeed, Justice Werdegar's prejudice analysis confirms that the EIR's assessment of Expo Phase 2's impacts, using the 2030 baseline, fulfilled the essential purpose of an EIR to provide the decision makers and the public in general with "detailed information about the effect which [the] proposed project is likely to have on the environment."  (§ 21061; see also § 21002.1, subd. (a).)

## II.

Instead of applying a straightforward abuse of discretion analysis, the majority holds:  "Projected future conditions may be used as the sole baseline for impacts analysis if their use in place of measured existing conditions — a departure from the norm stated in Guidelines section 15125(a) — is *justified by unusual aspects* of the project or the surrounding conditions.  That the future conditions analysis would be informative is insufficient, but an agency *does have discretion* to completely omit an analysis of impacts on existing conditions when inclusion of such an analysis would *detract from an EIR's effectiveness as an informative document*, either because an analysis based on existing conditions would be *uninformative* or because it would be *misleading* to decision makers and

11

the public." (Lead opn., *ante*, at p. 11, italics added.) Applying these rigid limitations, the majority concludes Expo Authority abused its discretion in approving the EIR's sole use of a 2030 baseline to measure Expo Phase 2's impacts on traffic and air quality.

As explained below, the majority's analysis suffers from several significant flaws.

### A. *The Majority's Restrictions Find No Support in CEQA and are Contrary to Principles Governing Review of Agency Decisions*

First and foremost, the stated restrictions find no support in CEQA or its Guidelines. Apart from emphasizing Guideline language stating that existing physical conditions will "normally" constitute the baseline for an impacts analysis (Guidelines, § 15125(a)) and that a lead agency should "normally" limit its examination to changes in the existing physical conditions (Guidelines, § 15126.2, subd. (a)), the majority offers no statutory or regulatory basis, and no evidence of legislative intent, reflecting that an agency has no discretion to omit an existing conditions analysis *unless such an analysis is so utterly devoid of value that it is uninformative or misleading*. Without more, it is a stretch to construe the bare language of the Guidelines in this manner. Nor are the Guidelines reasonably susceptible of a construction that bars an agency from selecting a projected future conditions analysis in lieu of an existing conditions analysis when the former (1) reflects a rational selection given the nature and circumstances of the project; (2) is realistic and furnishes substantial relevant information about a project's significant effects; and (3) otherwise allows for informed decisionmaking and informed public participation.[7]

---

[7] The majority's citation to Guidelines section 15126.6, which requires an EIR to consider and discuss a range of reasonable alternatives to a proposed

*(footnote continued on next page)*

In addition, the majority's restrictions do not align with the principle that an agency's selection of a baseline involves a discretionary determination of how to realistically measure a project's impacts. (See *Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 327-328.) When an agency reasonably relies on an alternative baseline, requiring an extra analysis with an existing conditions baseline is superfluous and runs counter to the CEQA principle that a reviewing court must defer to an agency's baseline selection when it is supported by the record, even if a different baseline would be equally reasonable — or perhaps even *more* reasonable — than the one selected. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435; Guidelines, § 15384, subd. (a).)

The majority's abuse of discretion analysis also ignores the basic precepts that a certified EIR is presumed adequate and that "the party challenging the EIR has the burden of showing otherwise." (*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 158; see *Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 117.) To wit, the majority finds the record lacking in substantial evidence justifying Expo Authority's decision to omit an analysis based on existing traffic congestion and air quality conditions.[8] Neighbors, however, never once contended during the administrative review process that the EIR was deficient for failing to use an existing conditions

---

*(footnote continued from previous page)*

project, adds nothing to the analysis. In the majority's own words, the Guideline "makes clear that *normally* the baseline for determining a project's significant adverse impacts is *not* the same as the no project alternative." (Lead opn., *ante*, at pp. 15-16, first italics added.)]

[8]    As explained, I conclude to the contrary. (See pt. I., *ante*.)

analysis.  Although Neighbors's reply brief refers to other individuals who supposedly did so, none of the alleged comments or EIR responses thereto is included as part of the stipulated administrative record presented to the trial court or to this court.  Hence, while the record's perceived inadequacy on this point comes as no surprise under the circumstances, what is startling is the majority's determination that the inadequacy inures to the benefit of the EIR's challenger.

Finally, the majority's gloss on Guidelines section 15125(a) is entirely unnecessary to advance the environmental goals of CEQA.  This is so because any baseline analysis — whether it evaluates the so-called norm of conditions existing before project approval or the conditions projected to exist at some future point — cannot be illusory and instead must be realistic and supported by substantial evidence.  (§ 21168.5; Guidelines, § 15384; see *Communities for a Better Environment*, *supra*, 48 Cal.4th at p. 322.)

### B.  *The Majority's Analysis Creates Uncertainties Regarding CEQA Compliance and Will Increase Project Costs and Delays*

The majority's analysis also suffers from ambiguity on a number of levels.  In particular, the majority fails to clarify whether its restrictions apply to all departures from the regulatory baseline norm.  By its terms, Guidelines section 15125(a) designates only two environmental settings as the normal baseline:  "at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced."  The majority, however, identifies an alternative baseline based on a distinct third environmental setting — which it calls the "date-of-implementation baseline" — that reflects environmental conditions projected to exist "at the time the proposed project would go into operation."  (Lead opn., *ante*, at p. 13.)  As the majority sees it, an agency might use such a baseline to analyze impacts when a project is not

14

scheduled to begin operations until years after the two events specified in Guidelines section 15125(a).**9**

Although the majority finds that an agency has discretion to employ a date-of-implementation baseline, it fails to explicitly state whether or not its restrictions on agency discretion apply when such a baseline is selected. Logically, the restrictions should apply because the problems perceived by the majority regarding future conditions baselines in general would seem to apply equally to date-of-implementation baselines, particularly when a project takes several years to implement. (See lead opn., *ante*, at pp. 16-17 [criticizing use of predictive models to forecast future conditions, even though the validity and accuracy of the models used here are not disputed].)

Moreover, the term "date of implementation" is nowhere mentioned in Guidelines section 15125(a), and the majority points to no other CEQA Guideline or statute providing a definition. While the majority offers its own definition of the term (the "environmental conditions that will exist when the project begins operations"; lead opn., *ante*, at p. 12), the absence of actual CEQA guidance on the issue creates uncertainty as to how much operation or implementation may be too much when determining the implementation date.

---

**9** In this case, for example, a so-called date-of-implementation baseline would have measured Expo Phase 2's predicted impacts on conditions projected to exist in 2015, a full eight years after the notice of preparation of an EIR was published in 2007. Although the majority essentially holds that use of a 2015 baseline would have been a reasonable and proper exercise of discretion (see lead opn., *ante*, at pp. 12-13, 24, 27), there is no indication that view was shared by any agency or member of the public participating in the administrative review process. And as previously noted, Neighbors complained during the review process that a 2035 baseline was required to accurately reflect the project's operational impacts.

Despite all this ambiguity, the majority appears to contemplate that use of a date-of-implementation baseline falls squarely within the existing conditions default. (Lead opn., *ante*, at pp. 12-13.) But the language of Guidelines section 15125(a) is clear in designating only two environmental settings — both of which refer to physical conditions existing in the study area *prior to a project's approval* — as the normal baseline. Under the guise of construing the physical conditions in those two environmental settings as encompassing conditions predicted to exist years in the future when a project is scheduled to begin operations, the majority accomplishes two things: while adding language to restrict an agency's discretion to omit an existing conditions analysis, the majority redefines what the Guideline means by "existing conditions," so as to exempt this particular category of future conditions analysis from those restrictions. But that is not all — the majority further suggests that a date-of-implementation analysis is properly understood as including an analysis based on yet another distinct environmental setting not mentioned in Guidelines section 15125(a), i.e., "impacts expected to occur during the project's early period of operation." (Lead opn., *ante*, at p. 13.) Although the judicial maneuvering on this point is creative, this court has no power to rewrite the Guideline so as to make it conform to a presumed intention that is not expressed. (See *Vogel v. County of Los Angeles* (1967) 68 Cal.2d 18, 26.)

In any event, there is no need to rewrite Guidelines section 15125(a) to provide for ordinary discretionary use of a date-of-implementation baseline in lieu of an existing conditions baseline. Rather, consistent with the Guideline's express contemplation that an existing conditions analysis is the norm but not mandatory, we should simply adhere to precedent recognizing that an agency enjoys discretion to select an alternative baseline that is reasonably suited to the nature of the project under environmental review and the totality of the circumstances under which the project is expected to occur. (See *Save Our Peninsula*, *supra*, 87 Cal.App.4th at

16

pp. 125-126 [where environmental conditions vary over time it may be necessary to consider conditions over a range of time periods; in some cases, conditions closer to the date of project approval, which may be years after environmental review is commenced, may be more relevant to the impacts determination]; see also *Communities for a Better Environment*, *supra*, 48 Cal.4th at pp. 327-328 [quoting *Save Our Peninsula*].) Moreover, as with any analysis of impacts on projected future physical conditions, a date-of-implementation analysis must be realistic and supported by substantial evidence.

Another issue is that the majority's restrictions on the exercise of agency discretion appear rather difficult to meet. It is unclear how an agency might show that an existing conditions analysis would be "uninformative" or "misleading," without actually conducting such an analysis. (Lead opn., *ante*, at p. 11.) It is also unclear just how "unusual" the aspects of a project or the surrounding conditions must be in order for a departure from the baseline norm to be "justified." (*Ibid*.) Indeed, even though both the trial court and the Court of Appeal found substantial evidence supporting Expo Authority's use of a 2030 baseline instead of a 2007 baseline (as do I), the majority's finding to the contrary demonstrates how rigorous the burden is intended to be.

Finally, because the majority so narrowly circumscribes an agency's discretion to depart from the regulatory baseline norm, the burdens and delay associated with preparing and defending EIRs are likely to increase. That is, even though CEQA expressly permits use of an alternative baseline in lieu of an existing conditions baseline, and even though use of an alternative baseline, standing alone, would allow for informed decisionmaking and public participation, the EIR must also include an analysis of the project's impacts on existing conditions unless its inclusion actually diminishes the EIR's effectiveness as an informational document. The majority's imposition of this extra analytical

17

requirement is wasteful and directly at odds with the dual legislative commands that courts shall not interpret CEQA or the Guidelines in a manner that imposes additional substantive requirements (§ 21083.1), and that agencies must not engage in unnecessary and costly administrative processes that do not materially improve public disclosure or informed decisionmaking (§ 21003, subd. (f)).

## III.

In sum, it cannot be disputed that a lead agency's "determination of the proper baseline for a project can be difficult and controversial, particularly when the physical conditions in the vicinity of the project are subject to fluctuations" or other significant changes. (*Cherry Valley*, *supra*, 190 Cal.App.4th at p. 337.) For all the reasons above, I conclude that an agency retains discretion to omit an analysis of a project's likely impacts with an existing conditions baseline, so long as the selected alternative of a projected future conditions baseline is supported by substantial evidence and results in a realistic impacts analysis that allows for informed decisionmaking and public participation.

I further conclude that, given the nature and the circumstances of the light rail project at issue, Expo Authority reasonably selected a 2030 baseline in lieu of an existing conditions baseline for measuring the project's operational impacts on traffic congestion and air quality. Finally, in light of the undisputed validity of the forecasting models used to predict the future traffic and air quality conditions, I also conclude that substantial evidence supports the 2030 baseline as a realistic baseline for analyzing the project's impacts.

**BAXTER, J.**

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
CHIN, J.

18

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

I agree with the entirety of the court's well-reasoned opinion except for the conclusion that the error in the environmental impact report (EIR) was not prejudicial. On this record, I cannot confidently infer that the EIR's failure to measure impacts against a baseline of existing conditions did not deprive the public of relevant information about the project.

The court's lucid analysis of the California Environmental Quality Act (CEQA) and applicable regulations firmly supports its holding that existing conditions comprise the normal baseline for measuring environmental impacts and that an agency may forego analyzing impacts against a baseline of existing conditions only "if such an analysis would be uninformative or misleading to decision makers and the public." (Maj. opn., *ante*, at p. 14, fn. omitted.) Further, in light of *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328, the court is correct that "an existing conditions analysis may take account of environmental conditions that will exist when the project begins operations; the agency is not strictly limited to those prevailing during the period of EIR preparation." (Maj. opn., *ante*, at p. 12; see *id.* at p. 13 ["[A] date-of-implementation baseline does not share the principal problem presented by a baseline of conditions expected to prevail in the more

1

distant future following years of project operation — it does not omit impacts expected to occur during the project's early period of operation."].)

Here, the Exposition Metro Line Construction Authority (Expo Authority) used a baseline of existing conditions to measure most of the predicted effects of the light-rail project, but it used a baseline of conditions projected to exist in 2030 to measure the project's expected impacts on traffic congestion and air quality. It is undisputed that the agency properly considered what the long-term impacts of the project would be in 2030. The issue is whether the agency properly considered those long-term impacts to the exclusion of any short-term impacts. In measuring traffic and air quality impacts solely against projected conditions in 2030, the EIR provided no analysis of such impacts against a baseline of existing conditions, including conditions in 2015 when the project is scheduled to begin operations.

As today's opinion explains: "Even when a project is intended and expected to improve conditions in the long term — 20 or 30 years after an EIR is prepared — decision makers and members of the public are entitled under CEQA to know the short- and medium-term environmental costs of achieving that desirable improvement. These costs include not only the impacts involved in constructing the project but also those the project will create during its initial years of operation. Though we might rationally choose to endure short- or medium-term hardship for a long-term, permanent benefit, deciding to make that trade-off requires some knowledge about the severity and duration of the near-term hardship." (Maj. opn., *ante*, at p. 16.)

Here, there is "no substantial evidence supporting the Expo Authority's decision to omit an analysis of the project's traffic and air quality impacts on existing environmental conditions." (Maj. opn., *ante*, at p. 24.) "By focusing solely on the project's operational impacts in the distant future, the EIR neglects to inform the public and decision makers explicitly of any operational impacts that

2

could occur in the project's first 15 years of operation." (*Ibid*.) The fact "that project area population, traffic, and emissions of air pollutants are expected to continue increasing through and beyond 2030 does not justify the agency's failure to analyze operational impacts under earlier conditions. The expectation of change may make it important for the agency to *also* examine impacts under future conditions . . . , but it does not constitute substantial evidence supporting a determination that an existing conditions analysis would be uninformative or misleading." (*Id.* at p. 25.)

After reaching these conclusions, the court holds that the EIR's failure to measure traffic and air quality impacts against existing conditions was harmless in this case. The court reasons that the EIR's extensive analysis of traffic congestion against conditions projected to exist in 2030 "demonstrates the lack of grounds to suppose the same analysis performed against existing traffic conditions would have produced any substantially different information." (Maj. opn., *ante*, at p. 28.) But the fact that the project in 2030 is expected to have only a small effect on traffic congestion when compared to conditions in 2030 provides no reason to think that the project in 2015, at the start of operations, would have no greater impact *when compared to conditions in 2015*.

The EIR compared measures of congestion in 2030 if the project is built to measures of congestion in 2030 if the project is not built. But the measures of congestion in 2030 if the project is not built reflect significant predicted increases in congestion due to population growth. Thus it is not surprising that the project is expected to have little impact on congestion in 2030 when measured against the heightened congestion expected in 2030. But that finding sheds no light on the extent or magnitude of the project's traffic impacts when it begins to operate in 2015, *before* the predicted increase in congestion due to population growth from 2015 to 2030. Without knowing how significant this transient impact on traffic

3

congestion might be, how are the public and decision makers to decide whether the short-term pain is worth the long-term gain promised by the light-rail project?

It is not speculative to suggest that examining the project's impact on traffic congestion in 2015 would yield different results. When the project begins to operate, ridership is expected to be at 77 percent of its eventual level. During that initial period, there may be an influx of cars to areas around the new transit stations, as people come to ride the train. While it is reasonable to assume that the worsening of congestion solely due to population growth is a more-or-less linear process, it is also reasonable to posit that the increase in congestion if the project is built would take the shape of a curve, with an initial steep increase due to an influx of cars and riders that later tapers off as the public adjusts to the new system. At the very least, it is not implausible to think that things may get worse before they get better. As Neighbors for Smart Rail contends, focusing solely on impacts in 2030 may mask earlier effects: intersections that are projected to worsen to critical levels of congestion if the project is not built may reach those levels sooner if the project is built. Or maybe not — but either way, CEQA does not permit the agency to simply leave the public guessing.

The EIR's measure of air quality impacts suffers from the same problem. The EIR says the project, at full ridership, is expected to reduce vehicle miles traveled by 0.38 percent in 2030. The 0.38 percent figure reflects the differential between (a) vehicle miles driven in 2030 if the project is built and (b) vehicle miles driven in 2030 if the project is not built. From this, the court extrapolates that "the 77 percent initial ridership implies that initially the project will reduce vehicle miles traveled only by 0.29 percent." (Maj. opn., *ante*, at p. 30, fn. 11.) The court derives the 0.29 percent figure by comparing (a) vehicle miles driven in 2015 when the project begins operation with 77 percent ridership and (b) vehicle miles driven *in 2030* if the project is not built. The proper comparison, however,

4

is the differential between (a) vehicle miles driven in 2015 when the project begins operation with 77 percent ridership and (b) vehicle miles driven *in 2015* if the project is not built.  As with traffic congestion, there is reason to believe the project might actually increase vehicle miles driven in the short term, as new transit stations attract people from near and far to ride the light rail.  Further, without some analysis of the issue, we can only guess what portion of light-rail riders consists of people who would otherwise drive or ride cars to reach their destinations as opposed to new commuters who, but for the project, would not have traveled to their destinations at all, by car or otherwise.

For the reasons above, I respectfully disagree with the court's conclusion that the EIR's failure to measure traffic congestion and air quality impacts against a baseline of existing conditions "did not deprive agency decision makers or the public of substantial information relevant to approving the project." (Maj. opn., *ante*, at p. 30.)  In all other respects, I join the court's opinion.


LIU, J.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Neighbors for Smart Rail v. Exposition Metro Line Construction Authority
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 205 Cal.App.4th 552
**Rehearing Granted**

_____

**Opinion No.** S202828
**Date Filed:** August 5, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Thomas I. McKnew, Jr.

_____

**Counsel:**

Elkins Kalt Weintraub Reuben Gartside, John M. Bowman and C. J. Laffer for Plaintiff and Appellant.

Alexander T. Henson for Sunnyvale West Neighborhood Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Nossaman, Robert D. Thornton, John J. Flynn III, Robert C. Horton, Lauren C. Valk and Lloyd W. Pellman for Defendants and Respondents.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza and Matthew S. Levinson for Associated General Contractors of California as Amicus Curiae on behalf of Defendants and Respondents.

Marcia L. Scully, Adam C. Kear; Brownstein Hyatt Farber Schreck, Lisabeth D. Rothman and Amy M. Steinfeld for Association of California Water Agencies as Amicus Curiae on behalf of Defendants and Respondents.

Andrea Sheridan Ordin and John F. Krattli, County Counsel, Ronald W. Stamm, Principal Deputy County Counsel; Remy Moose Manley, Tiffany K. Wright, Sabrina V. Teller and Amanda R. Berlin for Real Parties in Interest.

Remy, Thomas, Moose and Manley, Tiffany K. Wright; Woodruff, Spradlin & Smart, Bradley R. Hogin and Ricia R. Hager for Southern California Association of Governments, Foothill/Eastern Transportation Corridor Agency, San Joaquin Hills Transportation Corridor Agency, Metropolitan Water District of Southern California, San Joaquin Council of Governments, Madera County Transportation Commission, Riverside County Transportation Commission, Contra Costa Transportation Authority, Metro Gold Line Foothill Extension Construction Authority, Santa Clara Valley Transportation Authority, Orange County Transportation Authority and San Francisco County Transportation Authority as Amici Curiae on behalf of Defendants and Respondents and Real Parties in Interest.

**Page 2 – counsel continued**

**Counsel:**

Cox, Castle& Nicholson, Michael H. Zischke, Andrew B. Sabey, Rachel R. Jones; Carmen A. Trutanich, City Attorney (Los Angeles), Andrew J. Nocas, Timothy McWilliams and Siegmund Shyu, Deputy City Attorneys; Marsha Jones Moutrie, City Attorney (Santa Monica), Joseph Lawrence, Deputy City Attorney; Carol Schwab, City Attorney (Culver City); John F. Kratli, County Counsel (Los Angeles), Thomas J. Faugnan, Assistant County Counsel, and Helen S. Parker, Principal Deputy County Counsel, for League of California Cities, California State Association of Counties, City of Los Angeles, County of Los Angeles, Culver City and City of Santa Monica as Amici Curiae on behalf of Defendants and Respondents and Real Parties in Interest.

Kurt R. Wiese, Barbara B. Baird and Veera Tyagi for South Coast Air Quality Management District as Amicus Curiae on behalf of Defendants and Respondents and Real Parties in Interest.

Sedgwick, Anna C. Shimko, Matthew D. Francois and Sigrid R. Waggener for California Building Industry as Amicus Curiae on behalf of Defendants and Respondents and Real Parties in Interest.

Shute, Mihaly & Weinberger, Robert S. Perlmutter and Maya Kuttan for Sierra Club and Center for Biological Diversity as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John M. Bowman
Elkins Kalt Weintraub Reuben Gartside
2049 Century Park East, Suite 2700
Los Angeles, CA  90067
(310) 746-4400

Robert D. Thornton
Nossaman
18101 Von Karman Avenue, Suite 1800
Irvine, CA  92612
(949) 833-7800